## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JEROME JOHNSON | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 24-309 |
| | : | |
| SUPERINTENDENT BOOHER, THE | : | |
| DISTRICT ATTORNEY OF THE CITY | : | |
| OF PHILADELPHIA, THE | : | |
| ATTORNEY GENERAL OF THE | : | |
| STATE OF PENNSYLVANIA | : | |

## <u>MEMORANDUM</u>

KEARNEY, J.                                                                                    March 31, 2025

A state court trial judge twice misspoke during final jury instructions about the nature of a homicide charge against a man involved in robberies two nights in a row and a related shooting death. The trial judge mistakenly referred to a first degree murder charge when the Commonwealth only charged him with second degree murder arising from the shooting, but she realized her error a few minutes later and corrected herself before the jury. She also mistakenly referred to the burden of proof upon the defendant on an issue. The jury convicted him of second degree murder, assaults, and robberies resulting in a life sentence. The state courts dismissed his direct appeals.

He sought post-conviction relief in the state court challenging the effectiveness of his trial lawyer for not objecting to the mistaken homicide charge references during the jury instructions. The Pennsylvania Superior Court denied these challenges. He now asks us for habeas relief based on the same ineffectiveness arguments, a challenge to the sufficiency of the evidence of conviction for second degree murder, unfair conduct in his post-conviction proceedings, and a claim raised only in his reply brief concerning his speedy trial rights. We must defer to the final state court decisions on the insufficient evidence claim and ineffectiveness claims after we describe the proper standard of deference.  We cannot consider the reply brief speedy trial claim because it is unrelated

to the claims in the petition. And the claim about unfair post-conviction proceedings is procedurally defaulted without grounds for excusal. We dismiss the habeas petition and find no basis for an evidentiary hearing or a certificate of appealability.

### I.    Facts adduced from the state court record

Shafik Lamback, Mychal Cassel, and Jerome Johnson jumped into Mr. Johnson's white Lincoln Town Car to drive from West Philadelphia to North Philadelphia in the early morning hours of January 26, 2014 planning to rob a drug dealer.[1] Mr. Johnson brought a silver and black .380 handgun and Mr. Cassel brought a black .40 caliber handgun.[2]

***Mr. Johnson's conduct on January 26, 2014.***

The three men entered the New Diamond Chinese Store in North Philadelphia early on January 26, 2014 and encountered Marquise Kemp selling drugs.[3] Mr. Johnson asked Mr. Kemp if he had drugs and Mr. Kemp said yes.[4] Mr. Johnson then pointed his black .380 handgun gun at Mr. Kemp and said, "Don't move or I'm going to kill you," and "Give me everything."[5] Mr. Cassel stood to Mr. Kemp's right and Mr. Lamback guarded the door.[6] Mr. Kemp handed Mr. Johnson his black Armani Exchange bubble jacket containing money, Mr. Kemp's cell phone, marijuana, and Percocets.[7] Messrs. Johnson, Lamback, Cassel left the store, turned left, and approached a white vehicle parked on the same side of the road as the New Diamond Chinese Store, approximately five car lengths away.[8]

Mr. Kemp followed Mr. Johnson and his two friends out of the store and called to his friend Kyleaf Gordon, standing across the street, "They robbed me[.]"[9] Mr. Gordon began shooting at the men next to the white car.[10] Mr. Lamback crawled into the backseat of the car while Mr. Johnson, gun in hand, took out his keys and got into the driver's side of the car.[11] Mr. Cassel, standing outside the front passenger seat, fired multiple shots back at Mr. Gordon.[12] Mr. Kemp ran and Mr.

Gordon followed behind him.[13] Mr. Kemp looked back and saw Mr. Gordon fall facedown onto the ground.[14] Mr. Kemp stopped running and went to his friend.[15] Mr. Kemp flipped Mr. Gordon over, saw he was bleeding from the nose and mouth, and called the police.[16] Mr. Kemp left the scene before the police arrived; the white car sped away while Mr. Gordon lay in the street.[17] Mr. Lamback, Mr. Johnson, and Mr. Cassel returned to West Philadelphia and divided up the proceeds of the robbery equally.[18] Each received $50, a few Percocets, and a couple of bags of marijuana.[19]

Philadelphia Police Officers Anthony Santulli and Brian Nolan heard gunshots in the area around 1:45 AM while completing paperwork in their police car.[20] The officers informed police radio and drove to where they heard the gunshots.[21] They found an unresponsive male lying face down with a gunshot wound to his neck.[22] They placed the male into their police car and transported him to Temple Hospital, where hospital staff identified him as 23-year-old Kyleaf Gordon and pronounced him dead at 2:06 AM.[23]

Crime Scene Officers responded to the scene and recovered five fired cartridge casings and a projectile on Ridge Avenue.[24] The officers found two fired cartridge casings on the same side of the street as the New Diamond Chinese store and found three fired cartridge casings and projectile on the other side of the street.[25] Deputy Chief Medical Examiner Dr. Albert Chu swore a gunshot wound from a bullet entering Mr. Gordon's back and exiting his upper chest caused his death to a reasonable degree of scientific certainty.[26]

### Mr. Johnson's conduct on January 27, 2014.

Messrs. Johnson, Lamback, and Cassel engaged in further criminal activity the next night.[27] Mr. Johnson and Mr. Cassel picked Mr. Lamback up in the white Lincoln Town Car and drove to the Norman Blumberg Apartments at 24th Street and Jefferson Street in North Philadelphia to find pills.[28] Mr. Johnson and Mr. Cassel brought the same handguns they had carried the night before.[29]

The three men, plus another unidentified man who offered to help them find pills, went into the apartment complex and tried to locate pills on one of the upper floors without success.[30]

Mr. Lamback then left the apartment with the unidentified male. Mr. Johnson and Mr. Cassel remained.[31] Derek Fernandes exited the elevators to the lobby of the high-rise tower at approximately 2:45 AM, at which time he observed two men he never saw before.[32] One of the men pointed a silver handgun at Mr. Fernandes, ordered him not to move, and grabbed twenty dollars from his hand.[33] The gunman told the second man to check Mr. Fernandes's pockets, which he did.[34] Then the two men backed out of the building, with the gunman ordering Mr. Fernandes not to follow him or he would shoot.[35] Mr. Fernandes later identified Mr. Johnson as the man who robbed him.[36]

Mr. Fernandes ran to the door and saw the two men running toward Jefferson Street.[37] He exited the building and someone shot at him.[38] He told housing police in the courtyard about the robbery.[39] The officers exited their police vehicle, ordered the two men running toward Jefferson Street to stop, and identified themselves as police officers.[40] The two men fled the area together and led the officers on a foot chase for several blocks.[41] The officers lost sight of the men until they observed Mr. Johnson heading for a partially fenced in lot near 25th Street and Steward Street.[42]

A Federal Bureau of Investigation agent working in the area around the same time heard a radio call for shots fired by a black male wearing a silver-colored jacket, dark pants, and carrying a silver firearm.[43] The agent drove toward Blumberg Apartments, at which time he observed a man who matched Mr. Johnson's description running toward his vehicle with his gun in his right hand.[44] The agent activated his emergency lights and informed radio he had seen an individual matching the shooter's description.[45] The agent followed Mr. Johnson into the vacant lot and pulled his

vehicle partially into the lot.[46] He heard the police officers say, "Stop. Police." and observed them closing in on the suspect.[47] The agent exited his car and announced himself as an agent of the Federal Bureau of Investigation.[48] One of the police officers ordered Mr. Johnson to drop his weapon; when he did not, all three law enforcement officers pointed their weapons at Mr. Johnson.[49] Mr. Johnson then pointed his weapon at the three law enforcement officers, who responded by firing several rounds each at Mr. Johnson.[50] Mr. Johnson fell to his knees with his firearm still in his hand after the agent's first shot and fell face first into the ground when the officers continued shooting.[51] Unidentified persons immediately transported Mr. Johnson to the hospital.[52]

A different police officer went to the hospital to guard Mr. Johnson and took his clothing as evidence.[53] Mr. Johnson wore a black Armani Exchange bubble jacket, which Marquise Kemp later identified, and pants with a twenty dollar bill and a set of car keys for a 2000 Lincoln in the pockets.[54] Crime scene officers went to Blumberg Apartments and recovered one projectile from inside the lobby of the high-rise building and one fired cartridge casing from the ground near the Lincoln Town Car.[55] The police kept the Lincoln as evidence and later recovered a bullet from inside the roof.[56]

The Commonwealth executed a search warrant of the Lincoln Town Car and recovered from the glove box ownership paperwork in the name of Jerome Johnson.[57] DNA swabs taken from multiple areas on the car revealed the presence of DNA from Mr. Johnson, Mr. Lamback, and Mr. Cassel.[58]

### *The Commonwealth charges the three men and presents trial evidence.*

The Commonwealth charged Mr. Johnson with murder and related offenses stemming from the incident on January 26, 2014, and charged him with robbery, aggravated assault, and related

offenses stemming from the incident on January 27, 2014.[59] The Commonwealth charged Mr. Cassel with murder and related offenses and robbery and related offenses for his involvement in the incidents.[60] The Commonwealth charged Mr. Lamback with robbery and conspiracy for his involvement in the incidents; Mr. Lamback pleaded guilty after agreeing to cooperate with the Commonwealth against his co-conspirators.[61] The Commonwealth moved to consolidate the trials for the January 26 and January 27 incidents and the trial court granted the motion.[62] A jury tried Mr. Johnson and Mr. Cassel together in a consolidated trial in May 2018.[63]

Mr. Lamback testified about the events of January 26, 2014, including the scene in the New Diamond Chinese Store and the shoot-off between Mr. Gordon and Mr. Cassel.[64] Mr. Lamback identified himself, Mr. Johnson, and Mr. Cassel in video footage a detective recovered from inside and outside of the Chinese store.[65] The video footage showed the three men parking in front of the store, entering together, and surrounding Mr. Kemp.[66] Mr. Lamback also testified about the events of the following evening.[67]

An expert in firearms examination studied evidence from the incidents on January 26 and January 27. The expert swore two of the five fired cartridge casings recovered from the 2900 block of Ridge Avenue were fired from the same forty caliber firearm and three were fired from the same nine-millimeter firearm.[68] The fired cartridge casing recovered from the courtyard of Blumberg Apartments was fired from a .380 firearm and the projectile recovered from the lobby was fired from a .380 or a nine-millimeter firearm.[69] The bullet recovered from the roof of the Lincoln was fired from a forty caliber firearm or a ten-millimeter firearm.[70] Insufficient markings prevented the expert from comparing the fired cartridge casings to the firearm recovered from Mr. Johnson.[71]

### *The trial judge instructs the jury.*

The trial judge misspoke twice during her jury instructions.

She first instructed the jury on how it could find Mr. Johnson guilty of first-degree murder, although the Commonwealth only charged Mr. Johnson with second-degree murder. The judge stated, "the only way that you could possibly find Mr. Johnson guilty of First Degree Murder is, first, you would have to find that Mr. Cassel intended to kill Mr. Gordon with the specific intent and that either there was an object of a conspiracy, a specific conspiracy to kill Mr. Gordon, or Mr. Johnson evidenced his intent to kill, specific intent to kill, by acting as an accomplice. But, remember, he also has to have the intent, the specific intent to kill."[72] Mr. Johnson's trial counsel did not object to this instruction, but the judge later volunteered, "I was just corrected. Mr. Johnson is not charged with First Degree Murder. So, let's make it clear. So, when I'm talking take starting with First Degree Murder, it only applies to Mr. Cassel. . . . So, for Mr. Johnson, you don't even look for First Degree Murder."[73]

The trial judge also then misspoke when instructing the jury on the burden of proof for second-degree murder, stating, "If you find that the Commonwealth has proven all of the elements beyond a reasonable doubt, you must find the Defendant guilty. . . . If you find that the ***Defendant*** has not proven all the elements beyond a reasonable doubt, then you must find the Defendant not guilty."[74] Mr. Johnson's trial counsel did not object to this instruction and the judge did not issue a curative instruction. His trial counsel did not object to either error.

The jury convicted Mr. Johnson of second-degree murder, conspiracy to commit robbery, robbery, and firearm offenses for the January 26, 2014 conduct, and convicted him of robbery, aggravated assault, and other related charges for the January 27, 2014 conduct.[75] The trial judge sentenced Mr. Johnson to an aggregate term of life in prison on May 11, 2018.[76]

Mr. Johnson moved for post-verdict relief, which the trial judge denied without a hearing on May 21, 2018.[77]

### *Mr. Johnson directly appeals and petitions for post-conviction relief.*

Mr. Johnson timely appealed the verdict and sentence on June 5, 2018.[78] He raised the issue of whether the trial judge erred in denying his post-verdict motions when the weight and sufficiency of the evidence did not support a guilty verdict for second-degree murder.[79] Mr. Johnson did not raise on direct appeal the trial judge's erroneous jury instructions or the ineffectiveness of his trial counsel for failing to object to those instructions. The Pennsylvania Superior Court affirmed Mr. Johnson's judgment of sentence on July 9, 2020.[80] Mr. Johnson petitioned for allowance of appeal, which the Pennsylvania Supreme Court denied on November 18, 2020.[81] Mr. Johnson did not seek review from the Supreme Court.

Mr. Johnson moved for post-conviction collateral relief on August 23, 2021.[82] He argued his second-degree murder charge from January 26, 2014 "was not fairly litigated" because it was "intermingled" with his robbery charge from January 27, 2014, "making it highly unlikely for the jury . . . to be able to dissimilate the facts relating to either, as a separate incident."[83] He claimed the handgun from the January 27 robbery had no fingerprints and questioned how the handgun could have been the same weapon used in the January 26 incident resulting in Mr. Gordon's death.[84] He further argued the trial "was filled with many discrepancies. From police, to the witnesses."[85] "[T]he consolidation of the cases made for Justice to not Properly be served [sic]."[86] Mr. Johnson also mentioned "counsel ineffectiveness" in his petition although he included it as a form of requested relief rather than as a basis for relief.[87] Mr. Johnson, as in his direct appeal, did not raise the trial judge's erroneous references in the jury instructions or the ineffectiveness of his trial counsel for not objecting to those instructions.

The post-conviction judge (the same judge who presided over Mr. Johnson's trial) appointed post-conviction counsel and ordered counsel to file an amended petition or no-merit letter.[88] Mr. Johnson's post-conviction counsel filed a no-merit letter on September 8, 2021, requesting the judge dismiss the petition.[89] The post-conviction judge issued a notice of intent on September 10, 2021 under Pennsylvania Rule of Criminal Procedure 907 to dismiss Mr. Johnson's post-conviction petition without a hearing in twenty days as the issues raised in the petition appeared meritless.[90] Mr. Johnson moved on September 30, 2021 (the deadline for responding to the notice of intent) to withdraw his first post-conviction petition and replace it with a second petition.[91] He explained he did not raise all pertinent issues in his first petition because the COVID-19 pandemic had prevented him from going to the law library.[92] He did not specify which pertinent issues he wanted to raise, and he did not file a second petition. The post-conviction judge dismissed Mr. Johnson's petition for post-conviction relief in an October 7, 2021 Order and Opinion.[93] The judge found Mr. Johnson did not respond to the notice of intent and denied his request to withdraw and replace his post-conviction petition with a different one, reasoning "[s]uch a request would be tantamount to holding a petition in abeyance, allowing him to circumvent the PCRA time-bar."[94] "Moreover, a second petition would be fruitless as [post-conviction] counsel has complied with the technical requirements set forth in *Commonwealth v. Finley*, having thoroughly reviewed the record and finding no other issues to raise."[95]

Mr. Johnson appealed the dismissal of his post-conviction petition on October 25, 2021.[96] He raised two claims (the same claims before us today on habeas) as to whether his post-conviction counsel rendered ineffective assistance for failing to raise, in the post-conviction petition, trial counsel's failure to object to the trial judge's (1) second-degree murder jury instruction, which shifted the burden of proof to Mr. Johnson, and (2) mistaken and later corrected first-degree murder

instruction as to Mr. Johnson.[97] Mr. Johnson did not raise the judge's refusal to allow him to withdraw and replace his first post-conviction petition.

The Pennsylvania Superior Court affirmed the dismissal of Mr. Johnson's post-conviction petition on April 11, 2023 and denied his request for reargument on August 31, 2023.[98]

## II. Analysis

Mr. Johnson now timely petitions for habeas relief on four grounds:

1. Insufficient evidence to sustain the verdict of second-degree murder;

2. Ineffective assistance of trial counsel for failing to object to the trial court's jury instruction on second degree murder, which erroneously shifted the burden of proof to Mr. Johnson, and ineffective assistance of PCRA counsel for not raising this ineffective assistance claim in the PCRA petition;[99]

3. Ineffective assistance of trial counsel for failing to object to the trial court's erroneous jury instruction on first-degree murder, which Mr. Johnson was not charged with, and ineffective assistance of direct appellate counsel and PCRA counsel for not raising this ineffective assistance claim on appeal or in the PCRA petition; and

4. Violation of fundamental fairness arising from the PCRA proceedings when the PCRA court did not permit Mr. Johnson to withdraw and replace his PCRA petition.[100]

The Commonwealth concedes Mr. Johnson's petition is timely and his first three claims are exhausted but argues the Pennsylvania courts reasonably rejected them as meritless.[101] The Commonwealth does not address whether Mr. Johnson's fourth claim is exhausted but argues it is not cognizable.[102] Mr. Johnson replies we must construe his pro se petition liberally, and, as such, we must allow him to "rephrase the claims raised in the habeas petition for the purposes of clarity."[103] He then offers a new version of his habeas claims. The updated versions of Mr. Johnson's first three claims are substantively like the claims in his petition but with more detail.[104] The updated fourth claim, however, is totally different from the fourth claim in his petition. Mr. Johnson does not simply supplement the fourth claim with more details about errors in the post-

conviction decision. He instead drops that claim entirely and purports to raise a new ground concerning his speedy trial rights.[105] Mr. Johnson also cites case law about a federal court's need to have the full state court record before it when reviewing a habeas petition and argues each of his claims warrant evidentiary development.[106]

Mr. Johnson is not entitled to habeas relief on any of his claims; nor is he entitled to an evidentiary hearing or a certificate of appealability.

### A.  We first define the standard of review for clarity.

The Pennsylvania Superior Court already reviewed some of Mr. Johnson's claims for harmless error. The standard of review a federal court should use for habeas claims already reviewed for harmless error at the state court level is not a model of clarity. So, we find it useful to study the intersection between the Supreme Court's harmless error jurisprudence and Congress's mandates in the Antiterrorism and Effective Death Penalty Act of 1996 before addressing which test(s) we must apply to Mr. Johnson's claims.

Congress, through the Act, requires incarcerated persons seeking habeas relief from a state court judgment to "exhaust[] the remedies available in the courts of the State."[107] "A petitioner who has raised an issue on direct appeal, however, is not required to raise it again in a state post-conviction proceeding."[108] "[T]he federal habeas claim must have been "fairly presented" to the state courts, *i.e.,* it must be the substantial equivalent of that presented to the state courts. . . . [and] the state court must have available to it the same method of legal analysis as that to be employed in federal court."[109] "[W]here the petitioner presents a claim to the state courts in some form, and the 'method of analy[zing that claim] is the same under both Pennsylvania and federal law,' the exhaustion requirement is satisfied."[110] When a claim is unexhausted but it would be futile to seek

relief in state court now, the claim is "procedurally defaulted" and unreviewable by a federal court in most circumstances.[111]

Congress permits us to grant a petition for habeas relief on a claim adjudicated on the merits by the state court only if the state court's adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[112] The Act "imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt[.]'"[113] The Supreme Court instructs "an **unreasonable** application of federal law is different from an **incorrect** application of federal law."[114] We "may not issue the writ [of habeas corpus] simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."[115]

But the test set by Congress is not the only relevant consideration; we must also consider the Supreme Court's equitable doctrines.[116] The Supreme Court formulated two different standards used to determine the harmlessness of a federal constitutional error depending on whether a state or federal court is reviewing the error: the 1967 *Chapman v. California* standard, applied by state courts to cases on direct appellate review, and the 1993 *Brecht v. Abrahamson* standard, applied by federal courts to cases on habeas corpus review. "In *Chapman*, [the] Court held that, when a defendant demonstrates on direct appeal that a constitutional error occurred at his trial, his conviction cannot stand unless the government proves the error's harmlessness 'beyond a reasonable doubt.'"[117] "In *Brecht*, the Court resolved that this same standard was inappropriate for use in federal habeas review of final state-court judgments."[118] "Instead . . . a state prisoner should

not receive federal 'habeas relief based on trial error unless' he can show the error had a 'substantial and injurious effect or influence' on the verdict."[119] The Court explained the reasoning in *Brecht* makes more sense on habeas review because otherwise federal habeas courts would have "to engage in the identical approach to harmless-error review that *Chapman* requires state courts to engage in on direct review."[120]

And we have a third issue on the appropriate standard of federal judges' review of state court criminal convictions based on a standard later set by Congress. Congress passed the Antiterrorism and Effective Death Penalty Act of 1996 three years after the Supreme Court decided *Brecht*.[121] The passage of the Act caused confusion amongst federal courts with regard "to the issue of *Brecht*'s vitality."[122] The Supreme Court studied the relationship between *Brecht* and the Act in a series of opinions spanning from 2001 to 2007. In *Penry v. Johnson* (2001) and *Early v. Packer* (2002) the Court suggested in dicta if a federal court first finds a state court decision is contrary to federal law under section 2254, the court could then conduct a harmless error analysis under *Brecht*.[123] But then in *Mitchell v. Esparza* (2003), the Court analyzed a state court's harmless error determination without mentioning *Brecht*, leading some courts to believe they should only apply *Brecht* when the state court had not formally adjudicated a federal claim for harmless error.[124] The Court's analysis in *Mitchell* "open[ed] the door for the Court to express its position on [this] issue."[125] The Court four years later in *Fry* instructed the federal courts *Brecht* is the appropriate standard in habeas proceedings even when the state appellate court has not recognized the constitutional trial error and reviewed it for harmlessness under *Chapman*.[126] The Court explained its interpretation of section 2254(d)(1) in *Mitchell* did not "eliminate[] the requirement that a petitioner also satisfy *Brecht*'s standard."[127] But the Court also recognized it "makes no sense to

require formal application of both tests (AEDPA/*Chapman* and *Brecht*) when the latter obviously subsumes the former."[128]

Taken together, the Court's analysis in *Penry*, *Early*, *Mitchell*, and *Fry* seem to "outline the following general instructions:" (1) a federal court should first review the state court's harmless error analysis under section 2254(d)(1); (2) if the state decision is not contrary to or an unreasonable application of *Chapman*, the federal court must defer to the state court's decision; but if (3) the state court's decision ***is*** contrary to *Chapman*, that means an exception to section 2254 exists, and the federal court "will review the harmless error inquiry de novo under the traditional federal habeas requirement set forth by the Supreme Court in *Brecht*."[129]

But our Court of Appeals interpreted *Fry* to mean federal courts should conduct a de novo harmless error analysis under *Brecht* ***instead of*** applying the Act (as opposed to applying *Brecht* as a second step if the state court's decision was unreasonable under the Act).[130] The district court in *Bond v. Beard* applied the Act's standard of review.[131] Then the Supreme Court decided *Fry*. Our Court of Appeals explained its "analysis differ[ed] somewhat in light of *Fry* . . . which the Supreme Court issued after the District Court's opinion."[132] "*Fry* instructs us to perform our own harmless error analysis under *Brecht* . . . rather than review the state court's harmless error analysis under the AEDPA standard."[133]

Several years later in *Davis v. Ayala* the Supreme Court indicated de novo review under *Brecht* is not always necessary.[134] Instead, under "the highly deferential AEDPA standard[,]" a federal court may not overturn a state court decision unless the state court "applied *Chapman* 'in an "objectively unreasonable" manner.'"[135] "When a *Chapman* decision is reviewed under [the Act], 'a federal court may not award habeas relief under [section] 2254 unless ***the harmlessness determination itself*** was unreasonable.'"[136] "And a state-court decision is not unreasonable if

14

"'fairminded jurists could disagree' on [its] correctness."[137] Our Court of Appeals discussed *Davis*'s impact on the habeas landscape eight years ago in *Johnson v. Lamas*.[138] It explained if "a fairminded jurist could agree" with the state court's harmless error analysis under the Act, the petitioner "'necessarily cannot satisfy' *Brecht* . . . ."[139] In that scenario, we must defer to the state court's decision, "even if we might decide the case differently were we to undertake de novo review."[140] On the other hand, if the state court unreasonably applied federal law under the Act, we must then assess whether the error "had a 'substantial and injurious effect or influence in determining the jury's verdict'" under *Brecht*.[141]

The Supreme Court revisited this analysis three years ago in *Brown v. Davenport*.[142] The Court granted certiorari to decide whether a federal court may "grant habeas relief based solely on its independent assessment of the error's prejudicial effect under *Brecht*" or whether the federal court must also review the state court's decision under the Act.[143] The Court explained its earlier decisions do not mean "a petitioner who ***can*** satisfy *Brecht* also necessarily secures a victory under [the Act]."[144] Instead, after satisfying *Brecht*, "[the Act] too must be satisfied."[145] In short: "a federal court must ***deny*** relief to a state habeas petitioner who fails to satisfy either this Court's equitable precedents or [the Act]. But to ***grant*** relief, a court must find that the petitioner has cleared both tests."[146]

Our Court of Appeals then explained last year in *Lacombe v. Warden James T. Vaughn Correctional Center* "[t]he upshot [of *Davenport*] is that, to prevail on a habeas petition, a prisoner asserting trial error must establish both error under [the Act] and prejudice under *Brecht*."[147] Our Court of Appeals then analyzed the petitioner's two habeas claims. As to the claim the state breached its plea agreement under *Santobello v. New York*, our Court of Appeals applied *Brecht*, held any error was harmless, and therefore "affirm[ed] the District Court's denial of relief on

Lacombe's *Santobello* claim without reaching the [Act's] inquiry."[148] Our Court of Appeals explained although it did not need to separately analyze the petitioner's *Santobello* claim under the Act, that did not necessarily mean the state court's merits determination of that claim was reasonable.[149] As to the petitioner's *Strickland v. Washington* ineffective assistance of counsel claim, our Court of Appeals applied the Act, held the state court did not unreasonably apply *Strickland*, and therefore did not reach *Brecht*.[150]

We summarize our Court of Appeals's guidance on Supreme Court jurisprudence concerning the Act and *Brecht* as follows: after *Fry*, but before *Davis*, our Court of Appeals instructed federal district courts to always do a *Brecht* analysis de novo instead of reviewing the state court's harmless error analysis under the Act.[151] After *Davis*, but before *Davenport*, our Court of Appeals seemingly encouraged district courts to start by applying the Act and conduct a de novo review under *Brecht* only if the state court applied federal law unreasonably.[152] Following *Davenport* last year, our Court of Appeals recognizes it is appropriate to start *Brecht* instead of the Act in certain limited circumstances (namely, where doing *Brecht* first would function as a shortcut).[153] But there is a caveat: if we start with *Brecht* and find the petitioner prevails under our de novo analysis, we still must decide whether the state court's decision was unreasonable under the Act before we may grant the petitioner relief.[154] So, we think it makes sense to start with the Act in most cases—unless it is a case like *Lacombe*, where it is clear the petitioner did not suffer prejudice, but the "reasonableness" of the state court's decision is a closer call.[155]

We think it is worth putting a fine point on how we approach habeas cases because *Fry* is still good law.[156] And the Supreme Court's holding in *Fry* led to a line of cases where our Court of Appeals and district courts believed they must always conduct a *Brecht* analysis de novo instead of first applying the Act. In fact, some of our colleagues still take this approach.[157] But after tracing

the development of habeas corpus jurisprudence in this century, we think the Supreme Court and our Court of Appeals have moved away from this approach in most cases, and we must follow their direction.

Back to Mr. Johnson. The Commonwealth does not dispute Mr. Johnson exhausted his first three claims.[158] So, we must study "the 'last reasoned' state-court decision that addressed [those] claim[s]."[159] We start our analysis under the Act. Mr. Johnson's exhausted claims present mixed questions of fact and law, so we review them under section 2254(d)(1) rather than section 2254(d)(2), which applies when a petitioner challenges the underlying facts determined by the state court.[160] The state courts' decisions as to each of the exhausted claims were not unreasonable, so Mr. Johnson is not entitled to habeas relief on any of them. We dismiss Mr. Johnson's exhausted claims without reviewing them under *Brecht*.

We decline to consider the new version of Mr. Johnson's fourth claim as asserted in his reply and instead study the claim for which he timely petitioned for relief. The Commonwealth does not address whether the fourth claim is exhausted and/or procedurally defaulted, so we conduct this analysis sua sponte. We find Mr. Johnson's fourth claim is procedurally defaulted, and we dismiss this claim as well.

### B. We dismiss Mr. Johnson's first claim challenging the sufficiency of the evidence.

Mr. Johnson challenges the sufficiency of the evidence to support a conviction of second-degree murder. He claims Mr. Gordon's death occurred independently of the robbery because the shooting happened after Mr. Johnson and his companions left the New Diamond Chinese Store and Mr. Cassel shot Mr. Gordon in self-defense. So, "the evidence presented at trial was insufficient as a matter of law to convict him of second-degree murder."[161]

The last reasoned state court decision on this sufficiency of the evidence claim is the Superior Court's opinion affirming Mr. Johnson's judgment of sentence on direct appeal. The applicable standard to review an insufficient evidence claim in Pennsylvania required the Superior Court to "determine whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom when viewed in the light most favorable to the verdict winner, are sufficient to support all elements of the offense."[162] The Superior Court further explained it could not "reweigh the evidence or substitute [its] own judgment for that of the fact finder."[163] The court then set forth the elements the Commonwealth must prove to sustain a conviction for second-degree murder: "(1) a human being was unlawfully killed; (2) the defendant or an accomplice, while partners in a crime, committed the act that caused the killing; (3) the defendant or an accomplice committed the act in furtherance of that crime, and (4) that the defendant acted with malice."[164]

The Superior Court explained Mr. Johnson's theory he acted alone in the robbery and Mr. Cassel acted in self-defense "necessarily rests on the premise that the Commonwealth's evidence did not prove Cassel's involvement in the robbery and the conspiracy among the defendants to commit robbery."[165] But the Commonwealth adduced sufficient evidence to prove all three men were involved in the robbery: they left their neighborhood together, with guns, to find drug dealers in an unfamiliar area of the city; they exited the Lincoln Town Car and entered the Chinese store together; they surrounded Mr. Kemp and confiscated his jacket (and everything inside it) at gunpoint; they left the store and returned to the Town Car together; and, after the shoot-out, the three men returned home together and divided the proceeds equally.[166] As the three men were conspirators in a crime which risked the safety of others, "the jury could infer malice."[167] The Commonwealth also proved Mr. Cassel did not act in self-defense because "the defendants . . . provoked the use of force against them by robbing [Mr.] Kemp at gunpoint."[168] The Superior Court

found "sufficient evidence to prove beyond a reasonable doubt that [Mr.] Johnson committed second-degree murder[,]" concluded "the robbery and the murder were all one continuous event[,]" and affirmed the judgment of sentence.[169]

The Commonwealth argues the Superior Court correctly decided the insufficient evidence claim because video evidence and Mr. Lamback's testimony supported the jury's finding Mr. Johnson conspired to commit the robbery and the shooting happened immediately after the men left the scene of the robbery.[170]

We agree. We review the Superior Court's conclusion by making two inquiries: first, whether Mr. Johnson is entitled to habeas relief under the Act, which results only if the Superior Court's decision is contrary to federal law, and, if so, whether Mr. Johnson can establish prejudice under *Brecht*.[171] As to the first inquiry, "[t]he clearly established federal law governing [Mr. Johnson's] insufficient evidence claim is the standard set out in *Jackson v. Virginia*."[172] The Supreme Court in *Jackson* stated "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, ***any*** rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[173] The Superior Court reasonably applied Pennsylvania's analogue to the *Jackson* standard.[174] It reviewed the evidence independently, examined each element of second-degree murder, and held the Commonwealth proved second-degree murder beyond a reasonable doubt. We agree the substantial direct evidence (video footage and the testimony of one of Mr. Johnson's co-conspirators) proves beyond a reasonable doubt all three men committed a robbery and Mr. Gordon's death occurred in furtherance of that robbery. The court did not conduct a harmless error analysis because it did not see an error with regard to the sufficiency of the evidence.

We also see no error. The Superior Court's analysis comports with federal law, and we defer to its decision under the Act without reaching the *Brecht* inquiry. Mr. Johnson's first habeas claim fails.

### C.    We dismiss Mr. Johnson's second claim for ineffective assistance of counsel arising from an erroneous burden-shifting in the jury instructions.

Mr. Johnson asserts a layered claim of ineffectiveness against his post-conviction counsel and trial counsel. He alleges his trial counsel neither objected to nor requested a curative instruction following an erroneous jury instruction, and his post-conviction counsel failed to raise his trial counsel's purported ineffectiveness in his petition for post-conviction relief. Mr. Johnson directs us to the trial judge erroneously shifting the burden of proof when instructing the jury about second-degree murder: "If you find the **Defendant** has not proven all the elements beyond a reasonable doubt, then you must find the Defendants not guilty."[175] Mr. Johnson claims this trial error and the resulting ineffective assistance violated his due process rights.

The last reasoned state court decision on this claim is the Pennsylvania Superior Court's opinion affirming the denial of Mr. Johnson's petition. The Superior Court described the claim as a "'layered' ineffectiveness claim with respect to PCRA Counsel[,]" and explained the "critical inquiry" is whether "the first attorney" (i.e., Mr. Johnson's trial counsel) "did, in fact, render ineffective assistance of counsel."[176] "If that attorney was effective, then subsequent counsel cannot be deemed ineffective for failing to raise the underlying issue."[177] The Superior Court found under Pennsylvania law it must consider a challenged jury instruction in its entirety rather than "discrete portions[,]" and the standard of review for ambiguous instructions is "whether there is a reasonable likelihood that the jury applied it in a manner that violates the Constitution."[178] The Superior Court found the trial court in Mr. Johnson's case had not misled or confused the jury because "elsewhere in the jury charge" the trial judge properly instructed the jurors to presume Mr.

Johnson's innocence and the Commonwealth had the burden to prove his guilt.[179] The court found "no reasonable likelihood that the jury applied the jury instruction 'in a manner that violates the Constitution.'"[180] Even if the trial judge erred, "the error would be harmless" or "*de minimis*" given the "overwhelming evidence of [Mr. Johnson's] guilt."[181] Without saying so directly, the court concluded the performance of Mr. Johnson's trial counsel did not prejudice him.[182]

The Commonwealth argues the Pennsylvania Superior Court correctly held Mr. Johnson did not suffer prejudice from his counsel's failure to object to the jury instruction with the shifted burden of proof.[183] It also acknowledges the Superior Court may have erred by applying the "harmless error" standard rather than the *Commonwealth v. Pierce* prejudice test (the Pennsylvania counterpart of *Strickland v. Washington*).[184] But the Commonwealth posits the Superior Court's holding still does not contravene federal law because harmless error is a lesser standard than the *Strickland* prejudice standard.[185] So, in rejecting Mr. Johnson's claims under the "more favorable standard . . . [the court] also implicitly held that [Mr.] Johnson was not prejudiced under *Strickland*."[186]

We agree the Pennsylvania Superior Court applied the wrong standard under its own precedents; the Pennsylvania Supreme Court has held it is plain error to apply the harmless error standard to an ineffective assistance claim.[187] But the Superior Court's incorrect application of Pennsylvania law is not our concern: "[a] state court's misapplication of its own law generally does not raise a claim appropriate for habeas review by a federal court."[188] "Only where a state court's application of its own law also results in a violation of the Constitution or laws or treaties of the United States may a federal court intervene."[189] We must determine whether the state court's conclusion entitles Mr. Johnson to habeas relief under "the test [the Supreme] Court outlined in *Brecht* and the one Congress prescribed in AEDPA."[190]

21

We start with the Act. "To sustain an ineffective-assistance claim under *Strickland*, a defendant must show that (1) counsel's performance was deficient, meaning that it 'fell below an objective standard of reasonableness,' and (2) the deficient performance 'prejudiced the defense,' meaning 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"[191] Our Court of Appeals explained last month in *Laird v. Secretary, Pennsylvania Department of Corrections*, "[w]hen applying AEDPA deference to a *Strickland* claim, a federal court reviews the 'last reasoned' state-court decision that addressed that claim."[192] If "the 'last reasoned' decision for each *Strickland* prong . . . was made by different courts[,]" we should review the different decisions as to each prong and apply the Act's deferential standard to both of them.[193]

Our analysis today is not so simple because the Pennsylvania Superior Court did not conduct a straightforward *Strickland* analysis. The court instead applied a harmless error standard to Mr. Johnson's ineffective assistance claim, determined the underlying trial error was harmless error given the overwhelming evidence of guilt, and denied him relief. The court did not discuss whether Mr. Johnson's counsel's performance fell below an objective standard of reasonableness under *Strickland*'s first prong. And it only peripherally addressed prejudice under *Strickland*'s second prong by citing to an earlier Pennsylvania case where overwhelming evidence of guilt meant counsel's purported ineffectiveness failed the prejudice prong of the test. The analysis focused on the underlying trial court error rather than the ineffective assistance. So, we cannot review the state court's analysis of the *Strickland* prongs the same way our Court of Appeals instructed in *Laird*. Yet we still find the Superior Court did not unreasonably apply federal law because its decision is consistent with our Court of Appeals's analysis of an ineffective assistance claim in another case, *Whitney v. Horn*.[194]

Our Court of Appeals in *Whitney* studied a due process violation claim based on a faulty jury instruction and an ineffective assistance of counsel claim based on counsel's failure to object to the instruction.[195] Because the petitioner alleged "in this one claim both a due process violation based upon the faulty jury instruction and a Sixth Amendment violation based upon counsel's failure to object, it [was] not readily apparent whether the *Brecht* standard for harmless error and/or the *Strickland* standard of prejudice should be applied."[196] "Rather than applying the *Brecht* and *Strickland* tests separately," our Court of Appeals "used the *Brecht* test to reach a conclusion regarding whether or not there [had] been ineffective assistance of counsel."[197] The Court found if a petitioner can "demonstrate[] that the erroneous instruction had a "substantial and injurious effect or influence in determining the jury's verdict," such that it was not harmless under *Brecht* . . . he has also demonstrated that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different[]'" under *Strickland*.[198] Conversely, "an error that is harmless under *Brecht* is also considered non-prejudicial under *Strickland*."[199] Our Court of Appeals concluded the trial judge's erroneous jury instructions related to specific intent "arguably denied Whitney the due process of law." Still, his "claim of prejudice fail[ed] under both *Brecht* and *Strickland*[]" because the evidence of his mental state was overwhelming.[200]

Today, unlike in *Whitney*, we are not applying *Brecht* de novo to reach a conclusion under *Strickland*; we are applying the Act. Even so, our Court of Appeals's reasoning in *Whitney* convinces us the Superior Court's decision was reasonable. A state court's harmless error determination is not unreasonable under the Act if a fairminded jurist could agree with it.[201] And if a fairminded jurist could agree with the determination, the petitioner "'necessarily cannot satisfy' *Brecht*."[202] The *Chapman* standard requires a trial error be "harmless beyond a reasonable doubt."[203]

The Superior Court in reviewing Mr. Johnson's conviction found the erroneous jury instructions could not have contributed to Mr. Johnson's verdict because, viewed as a whole, the instructions did not shift the burden of proof and the Commonwealth presented overwhelming evidence of Mr. Johnson's guilt.[204] That is precisely what *Chapman* requires.[205] A fairminded jurist could certainly agree with the Superior Court's conclusion the jury instruction was, in context, harmless.[206] We find the state court's harmless error determination was reasonable under the Act; as such, Mr. Johnson necessarily cannot satisfy *Brecht*.[207] This finding compels us to conclude the state court's decision was also reasonable under *Strickland* even though the state court did not study *Strickland*'s two prongs. Why? "[A]n error that is harmless under *Brecht* is . . . considered non-prejudicial under *Strickland*."[208] The Superior Court's finding of harmless error, and its derivative conclusion Mr. Johnson's trial counsel and post-conviction counsel were not ineffective, comports with federal law.[209] We dismiss Mr. Johnson's second habeas claim under the Act.

### D. We dismiss Mr. Johnson's third claim challenging ineffective assistance arising from an erroneous jury instruction on first-degree murder.

Mr. Johnson asserts a second layered claim of ineffectiveness against his post-conviction counsel, his direct appellate counsel, and his trial counsel. He alleges his trial counsel failed to object to an erroneous instruction first mentioning first-degree murder before correcting the instruction, his direct appellate counsel failed to raise and preserve the issue for future appeals, and his post-conviction counsel failed to raise the claim in the post-conviction petition.[210] The disputed jury instruction occurred when the trial judge instructed the jury about first-degree murder, as Mr. Johnson was only charged with second-degree murder: "So, remember, the only way that you could possibly find Mr. Johnson guilty of First Degree Murder is, first, you would have to find that Mr. Cassel intended to kill Mr. Gordon with the specific intent and that either there was an object of a conspiracy, a specific conspiracy to kill Mr. Gordon, or Mr. Johnson

evidenced his intent to kill, specific intent to kill, by acting as an accomplice. But, remember, he also has to have the intent, the specific intent to kill."[211] But later in the jury instruction when the trial court "review[ed] the highlights[,]" she stated, "I was just corrected. Mr. Johnson is not charged with First Degree Murder. . . . So, for Mr. Johnson you don't even look for First Degree Murder."[212] Mr. Johnson does not allege this trial error and the related ineffective assistance of counsel violated his due process rights, but we liberally construe this claim as a due process claim consistent with our obligations to give leeway to pro se habeas petitions.[213]

The last reasoned state court decision on this claim is the Superior Court's opinion affirming the denial of Mr. Johnson's petition for post-conviction relief. The Superior Court found this claim meritless because the trial court corrected itself and "a jury is presumed to follow a trial court's instructions."[214] "Thus, Trial Counsel, in not objecting to the trial court's incorrect statement which the court remedied shortly thereafter, was not ineffective."[215] The Superior Court found the trial judge's incorrect instruction on first-degree murder, like the judge's erroneous burden-shifting, was harmless.[216]

As noted above, the Superior Court's incorrect application of the harmless error standard to this claim under Pennsylvania law does not impact our analysis.[217] We must decide whether Mr. Johnson establishes error under the Act and prejudice under *Brecht*.[218] Again, we start by applying the deferential standard set forth in section 2254(d)(1) of the Act to the "'last reasoned decision' for each *Strickland* prong[.]"[219] The Superior Court briefly addressed *Strickland*'s performance prong with regard to Mr. Johnson's second ineffective assistance claim—"Trial Counsel, in not objecting to the trial court's incorrect statement which the court remedied shortly thereafter, was not ineffective."—but did not explicitly address *Strickland*'s prejudice prong. As with Mr. Johnson's other ineffective assistance claim, the absence of fully developed analyses of both

25

*Strickland* prongs in the state court opinion does not preclude a finding of reasonableness under the Act.

We again must decide whether a fairminded jurist could agree with the state court's harmless error analysis.[220] The harmless error test set by the Supreme Court in *Chapman* requires us to ask whether the state court acted unreasonably in finding an error was harmless beyond a reasonable doubt; *i.e.*, there is no "reasonable possibility" it "might have contributed to the conviction . . . ."[221] The Superior Court found the trial judge's erroneous instruction on first-degree murder was harmless because the judge provided a curative instruction. The court presumed the jury listened to the curative instruction. This was not an unreasonable presumption; like Pennsylvania courts, "[f]ederal courts presume that juries comply with the instructions given to them by the trial judge, including curative instructions."[222] And, although the Superior Court did not reach this point, the trial judge's erroneous instruction on first degree murder plainly did not contribute to Mr. Johnson's verdict because the jury did not convict him of first degree murder.[223] So, a reasonable jurist could agree with the Superior Court's harmless error determination on Mr. Johnson's second ineffective claim, and we must defer to that determination under the Act.

A finding of reasonableness under the Act means Mr. Johnson cannot show prejudice under *Brecht* or *Strickland*.[224] We must dismiss Mr. Johnson's third habeas claim arising from the mistaken reference to first degree murder.

### E.  We dismiss Mr. Johnson's fourth claim as procedurally defaulted.

We next turn to Mr. Johnson's fourth ground for relief. He alleges the post-conviction proceedings "violated fundamental fairness" because he moved to amend his petition on September 30, 2021 but the post-conviction judge (earlier serving as the trial judge) dismissed his

petition without a hearing on October 7, 2021.[225] We liberally construe this claim as a due process claim.

The Commonwealth argues this claim is not cognizable because the post-conviction judge's refusal to allow him to amend his petition lies in state law, and matters of state law are not cognizable on federal habeas review.[226] It also argues the claim is meritless because Mr. Johnson does not assert how the denial of the petition prejudiced him.[227] The Commonwealth claims Mr. Johnson "successfully raised several entirely new claims of action on appeal which were considered *de novo* by the Superior Court"—this presumably refers to the ineffective assistance claims discussed above—and he can raise additional claims in a successive post-conviction petition if he wishes.[228]

The Commonwealth is incorrect on this last point. Petitions for post-conviction relief must be filed within one year of a judgment becoming final, and "a judgment becomes final at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of time for seeking the review."[229] The Superior Court affirmed Mr. Johnson's sentence on direct appeal on July 9, 2020, and the Pennsylvania Supreme Court denied his petition for allowance of appeal on November 18, 2020. Mr. Johnson's time to file a petition or a successive petition for post-conviction relief started to run the day his time to file a petition for a writ of certiorari to the United States Supreme Court expired—February 16, 2021 (ninety days after the Pennsylvania Supreme Court denied his petition for allowance of appeal). So, unless Mr. Johnson can meet one of the narrow exceptions excusing untimely petitions, his deadline to petition for post-conviction relief passed on February 16, 2022. And, in any event, the post-conviction relief judge barred him from filing a second petition because

doing so would be "fruitless."[230] So, we do not see how Mr. Johnson could, at this point, raise additional claims in a second petition for post-conviction relief.

We need not address the Commonwealth's other argument Mr. Johnson's fourth claim is not cognizable on habeas review. The fourth claim is procedurally defaulted, so we do not reach its merits.[231]

### 1. Mr. Johnson may not amend his habeas petition by rephrasing his fourth claim in his reply.

We must address Mr. Johnson's reply before reaching the issue of procedural default. He argues we should allow him to rephrase the claims in his habeas petition "for the purposes of clarity" and asserts a fourth ground for relief entirely distinct from the one in his habeas petition.[232] The fourth claim in his habeas petition challenges the post-conviction relief judge's refusal to allow him to withdraw and file a new petition.[233] The "rephrased" claim in his reply concerns his speedy trial right.[234]

Our obligation to construe Mr. Johnson's pro se petition liberally does not require us to accept this new version of his claim. Even if Mr. Johnson properly moved to amend his habeas petition instead of simply asserting a new claim in his reply brief, we would not permit him to amend. "The Federal Rules of Civil Procedure apply to motions to amend habeas corpus motions."[235] When amendment as a matter of course is no longer permitted, Rule 15(a) provides we should freely give parties leave to amend "when justice so requires."[236] Our Court of Appeals in *United States v. Duffus* held a petitioner could not amend his petition after the Act's limitations period had expired because the amendment did not simply "clarify a claim initially made[,]" but sought to add an entirely new claim.[237] Our Court of Appeals found the new claim did not relate back to the petitioner's first petition under Rule 15(c).[238] Permitting the amendment would be

"contrary to the policy of the AEDPA, which requires courts to measure the running of the limitations periods from the date on which the judgment of conviction becomes final."[239]

We now face this same issue. Mr. Johnson's "rephrased" petition does not clarify his existing claims; he adds an entirely new claim about his right to a speedy trial. As the Commonwealth explains in its thoughtful memorandum on timeliness, Mr. Johnson's time to file a habeas petition under the Act expired on March 25, 2024.[240] Allowing him to now assert a new claim, unrelated to his original petition under Rule 15(c), would permit an improper end run around the Act's limitations period.

We decline to consider Mr. Johnson's rephrased fourth claim.

### 2. Mr. Johnson's fourth claim is procedurally defaulted.

Mr. Johnson's fourth claim concerning the fairness of his post-conviction proceedings is procedurally defaulted. We may not grant a habeas petition to "a person in custody pursuant to the judgment of a State court . . . unless . . . the applicant has exhausted the remedies available in the courts of the State . . . ."[241] "State prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."[242] "In Pennsylvania, petitioners afford the state courts that opportunity by fairly presenting their claims to the Superior Court, either on direct review or on appeal of a petition under Pennsylvania's Post Conviction Relief Act . . . ."[243] "To fairly present a claim, a petitioner must introduce both the legal theory and its underlying factual support."[244] "When a petitioner has failed to exhaust a claim by failing to 'fairly present' it to the state courts, the claim is considered to have been procedurally defaulted if the petitioner may no longer seek further relief on the claim in state court."[245]

Mr. Johnson did not fairly present his fourth claim to the state courts. The claim arose when the post-conviction judge declined to let him file a second, or amended, petition on October 7, 2021. So, the earliest Mr. Johnson could have presented this claim would have been in his appeal of the post-conviction judge's decision. But he raised only ineffective assistance claims when he appealed the dismissal of his petition.[246] He did not mention the allegedly unfair post-conviction proceedings and thus did not exhaust the claim. The Superior Court affirmed the post-conviction judge's decision on April 11, 2023 and denied his request for reargument on August 31, 2023.[247] Mr. Johnson did not petition for allowance of appeal to the Pennsylvania Supreme Court. His time to appeal expired on September 30, 2023.[248] So, raising the claim about unfair post-conviction proceedings on appeal is no longer an option.

Raising the claim in a second or successive post-conviction petition is not an option, either. Even assuming the post-conviction judge's purported error—refusing to permit Mr. Johnson to withdraw and file a new petition—could be construed as a cognizable issue to raise in a second or successive petition, Mr. Johnson's time for filing such a petition passed more than three years ago. So, "we conclude that it would be futile for [Mr. Johnson] to return to state court in an effort to attempt to bring a second PCRA proceeding raising the unexhausted claims he has included in his federal habeas petition."[249]

But we could review a defaulted claim and "excuse the default only upon a showing of 'cause and prejudice' or a 'fundamental miscarriage of justice.'"[250] Mr. Johnson makes no allegations to support a finding of cause and prejudice or a fundamental miscarriage of justice.

We must dismiss his procedurally defaulted and recently raised fourth habeas claim.

### F.  We find no basis for an evidentiary hearing.

We lastly address Mr. Johnson's request for an evidentiary hearing. Mr. Johnson argues the Supreme Court's holding in *Townsend v. Sain* requires federal courts to grant an evidentiary hearing to resolve converted factual questions whenever the state has not produced all portions of the trial transcript, pleadings, court opinions, or other pertinent documents which the state court relied on in making its finding.[251] Mr. Johnson claims evidentiary development is warranted with respect to each of his four claims.[252]

We first address Mr. Johnson's argument the Supreme Court's holding in *Townsend* compels us to hold an evidentiary hearing when the state court has not produced the whole record or important parts of it. This is an incorrect reading of the Supreme Court's analysis. The Supreme Court in *Townsend* instructed "[a] District Court sitting in habeas corpus clearly has the power to compel production of the complete state-court record."[253] "[I]f because no record can be obtained the district judge has no way of determining whether a full and fair hearing which resulted in findings of relevant fact was vouchsafed, [***then***] he [or she] must hold [an evidentiary hearing]."[254] In other words, an evidentiary hearing is only required if we cannot obtain the record through other means.

It is not entirely clear if Mr. Johnson is suggesting the record is incomplete in this case because he only cites *Townsend* for general propositions and says nothing about the record from his own state court proceedings. To the extent he is concerned about an incomplete state court record in this case, his concerns do not warrant an evidentiary hearing. We determined portions of the record were missing from the filings on our docket and ordered the Commonwealth to produce those portions we needed for a fulsome review of Mr. Johnson's habeas petition. So, we do not

face the situation contemplated in *Townsend* where an evidentiary hearing is required because we are unable to obtain the record. We have the record and the facts are not in dispute.

At the bottom line, Congress through the Act and subsequent decisions by the Supreme Court narrowed the applicability of *Townsend*. The Supreme Court recognized in *Schriro v. Landrigan* that Congress "requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'"[255] "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief."[256] "[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."[257] Several years later in *Cullen v. Pinholster*, the Supreme Court held "review under [section] 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."[258]

The state court studied Mr. Johnson's claims (except for his fourth) on the merits. The state court record precludes habeas relief. And because our section 2254(d)(1) analysis is limited to the state court record we cannot expand the record by granting an evidentiary hearing. Mr. Johnson's request for an evidentiary hearing is denied as to his first three claims under *Pinholster*. We must also deny Mr. Johnson's request for an evidentiary hearing as to his fourth claim because it is procedurally defaulted.

### G.  We decline to issue a certificate of appealability.

Mr. Johnson has not requested a certificate of appealability, but we may grant one sua sponte if warranted.[259] A certificate of appealability is not warranted today. "Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals

from . . . the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court[.]"[260] "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."[261] As to the three claims we decided on the merits, Mr. Johnson "would have to show that the District Court's disposition is reasonably debatable, or that 'the issues presented are adequate to deserve encouragement to proceed further.'"[262] As to the claim we rejected "on procedural grounds without reaching [Mr. Johnson's] underlying constitutional claim, a [certificate of appealability] should issue when [he] shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."[263] Mr. Johnson has not shown his first three claims deserve encouragement to proceed further. Nor has he shown jurists of reason could debate our procedural ruling on his fourth claim. We decline to issue a certificate of appealability.

## III.    Conclusion

Mr. Johnson's first three claims for habeas relief are exhausted but lack merit. His fourth claim is procedurally defaulted. We deny and dismiss Mr. Johnson's petition for a writ of habeas corpus. We deny a certificate of appealability.

---

[1] *Commonwealth v. Johnson (Johnson I)*, No. CP-51-CR-5331-2014, 2018 WL 11260480, at *1, *2 (Pa. Ct. Com. Pl. Aug. 6, 2018). We base our analysis on the trial court's summary of the evidence. We may not revisit or alter the facts adduced at trial. We also extensively reviewed the state court record. *See* ECFs 11, 16.

[2] *Johnson I*, 2018 WL 11260480, at *2. Neither Mr. Johnson nor Mr. Cassel had a license to carry a firearm in Pennsylvania. *Id.* at *5.

[3] *Id.* at *3.

[4] *Id.*

[5] *Id.* at *2, *3.

[6] *Id.* at *3.

[7] *Id.* at *2, *3.

[8] *Id.* at *2.

[9] *Id.* at *2, *3.

[10] *Id.*

[11] *Id.* at *3.

[12] *Id.*

[13] *Id.* at *2.

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.* at *3.

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] *Id.* at *4.

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] *Id.*

[44] *Id.*

[45] *Id.*

[46] *Id.*

[47] *Id.*

[48] *Id.*

[49] *Id.*

[50] *Id.* at *5.

[51] *Id.*

[52] *Id.*

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] *Id.*

[57] *Id.*

[58] *Id.*

[59] *Id.* at *1.

[60] *Id.*

[61] *Id.*

[62] *Id.*

[63] *Id.*

[64] *Id.* at *3.

[65] *Id.*

[66] *Id.*

[67] *Id.*

[68] *Id.* at *5.

[69] *Id.*

[70] *Id.*

[71] *Id.*

[72] Trial Tr. vol. 1, 142:1–11 (ECF 16-5 at 38 (using the pagination assigned by the CM/ECF docketing system)).

[73] *Id.* at 157:7–11 (ECF 16-5 at 42).

[74] *Id.* at 146:9–16 (ECF 116-5 at 39) (emphasis added).

[75] *Johnson I*, 2018 WL 11260480, at *1.

[76] *Id.*

[77] *Id.*

[78] *Id.* at *2.

[79] *Commonwealth v. Johnson (Johnson II)*, 236 A.3d 1141, 1149 (Pa. Super. Ct. 2020).

[80] *Id.* at 1153.

[81] *Commonwealth v. Johnson (Johnson III)*, 242 A.3d 304 (Pa. 2020).

[82] ECF 11 at 243–50 (using the pagination assigned by the CM/ECF docketing system).

[83] *Id.* at 250.

[84] *Id.*

[85] *Id.*

[86] *Id.*

[87] *Id.* at 248.

[88] *Id.* at 24–25, 254.

[89] ECF 16-8 at 2–9 (using the pagination assigned by the CM/ECF docketing system).

[90] ECF 11 at 256.

[91] *Id.* at 258–61.

[92] *Id.* at 260.

[93] *Commonwealth v. Johnson (Johnson IV)*, CP-51-CR-5331-2014, slip op. at 10 (Pa. Ct. Com. Pl. Oct. 7, 2021) (unpublished Order and Opinion, *see* ECF 11 at 265–74). The judge framed Mr. Johnson's post-conviction ineffective assistance claims as challenging appellate counsel for failing to challenge the weight of the evidence and challenging trial counsel for failing to call a potential alibi witness. *Id.* at 4. The judge explained Mr. Johnson did not raise the second claim concerning

the alibi witness in his pro se petition, but his post-conviction counsel nevertheless addressed the claim in the no-merit letter. *Id.* at 7.

[94] *Id.* at 3, 10 (citing *Commonwealth v. Beatty*, 207 A.3d 957, 963 (Pa. Super. Ct. 2019)). This reasoning appears to be incorrect. In *Beatty*, the case Mr. Johnson's post-conviction judge cited, the petitioner timely filed his first post-conviction petition on January 22, 2024 and pursued an appeal after the judge denied the petition. *Beatty*, 207 A.3d at 963. The petitioner then filed a second petition on September 8, 2014 although his appeal of the first petition was still ongoing. *Id.* The Superior Court held the trial judge erred by holding the second petition in abeyance and reinstating the second petition in July 2016. *Id.* "Under Pennsylvania law, Appellant had the option of either going forward with his appeal from the order denying his first PCRA petition or filing and pursuing a second PCRA petition, but he could not do both." *Id.* (citing *Commonwealth v. Zeigler*, 148 A.3d 849, 852 (Pa. Super. Ct. 2016)). The Superior Court explained the trial judge had no authority to reinstate the second petition in 2016 and use the original date of its filing (September 8, 2014) because doing so "circumvent[ed] the PCRA timeliness requirements." *Id.*

That is not what happened here. Mr. Johnson asked to withdraw his first post-conviction petition before the trial judge had even ruled on it. So, it was not a situation where Mr. Johnson filed a second post-conviction petition while the appeal of the first petition was still ongoing. We fail to see how permitting Mr. Johnson to file a second petition would have impermissibly "circumvent[ed] the PCRA time-bar." *Johnson IV*, slip op. at 10. The judge herself recognized earlier in her opinion that Mr. Johnson had until February 16, 2022 to bring a timely post-conviction claim. *Id.* at 5. He requested to file a second post-conviction petition in October 2021—months before his post-conviction deadline expired. It is true Pennsylvania law does not permit a petitioner to file a second post-conviction petition while an appeal of a first post-conviction petition is ongoing but, at the time Mr. Johnson asked to file a second petition, he had not yet appealed the court's ruling on his first petition because the judge had not ruled on it yet. Had the judge not expressly told Mr. Johnson he could not file a second petition, he might have decided not to appeal the first petition and simply filed a second petition—which, as the court in *Beatty* recognized, would have been permissible, at least on timelines grounds. (Although the judge's decision that a second petition would have been fruitless on the merits is another matter).

[95] *Johnson IV*, slip op. at 10.

[96] ECF 11 at 287.

[97] *Commonwealth v. Johnson (Johnson V)*, No. 2235 EDA 2021, 2023 WL 2886741, at *3 (Pa. Super. Ct. Apr. 11, 2023). Mr. Johnson also raised the issue of the ineffectiveness of his post-conviction counsel by failing to raise, in the petition, trial counsel's failure to assert a speedy trial argument. *See id.*

[98] *Id.* at *8.

[99] Pennsylvania's Post-Conviction Relief Act (PCRA) "provides for an action by which persons convicted of crimes they did not commit and persons serving illegal sentences may obtain collateral relief." 42 PA. STAT. AND CONS. STAT. § 9542; *see generally id.* § 9541 *et seq.*

---

[100] *See generally* ECFs 1, 1-1.

[101] ECF 8 at 10 (using the pagination assigned by the CM/ECF docketing system).

[102] ECF 8.

[103] ECF 14 at 5 (using the pagination assigned by the CM/ECF docketing system). We note several of the pages in Mr. Johnson's reply appear to be out of order.

[104] *Id.* at 3–4, 6–7, 9.

[105] *Id.* at 10–11.

[106] *See generally id.* Mr. Johnson does not provide an argument for the case law he cites in the "Absent [sic] of State Record" section of his reply. ECF 14 at 2. It is possible he is trying to draw attention to the fact the Commonwealth did not attach the trial transcript to any of its filings and the Philadelphia County Court of Common Pleas did not file the transcript as part of the state court record in violation of our January 24, 2024 Order. ECF 4. We remedied these issues. *See infra* Section II.F.

[107] 28 U.S.C. § 2254(b)(1)(A).

[108] *Werts v. Vaughn*, 228 F.3d 178, 192 (3d Cir. 2000) (quoting *Lambert v. Blackwell*, 134 F.3d 506, 513 (3d Cir. 1997), *as amended* (Jan. 16, 1998)).

[109] *Id.* (quoting *Lambert*, 134 F.3d at 513).

[110] *Richardson v. Piazza*, No. 07-2065, 2010 WL 234852, at *4, n.3 (E.D. Pa. Jan. 20, 2010) (second alteration in original) (quoting *Evans v. Ct. of Common Pleas*, 959 F.2d 1227, 1232 (3d Cir. 1992)).

[111] *See Keller v. Larkins*, 251 F.3d 408, 415 (3d Cir. 2001) (first citing *McCandless v. Vaughn*, 172 F.3d 255, 260 (3d Cir. 1999); then quoting *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)).

[112] 28 U.S.C. § 2254(d)(1)–(2).

[113] *Renico v. Lett*, 559 U.S. 766, 773 (2010) (first quoting *Lindh v. Murphy*, 521 U.S. 320, 333, n.7 (1997); then quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)).

[114] *Williams v. Taylor*, 529 U.S. 362, 410 (2000).

[115] *Renico*, 559 U.S. at 773 (quoting *Williams*, 529 U.S. at 411).

[116] *Brown v. Davenport*, 596 U.S. 118, 122, 134.

[117] *Davenport*, 596 U.S. at 133 (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)).

---

[118] *Id.* (citing *Brecht v. Abrahamson*, 507 U.S. 619, 633–34 (1993)).

[119] *Id.* (quoting *Brecht*, 507 U.S. at 637).

[120] *Brecht*, 507 U.S. at 636.

[121] Congress, through section 2254(d)(1) of the Act, prohibits federal courts from granting habeas relief on claims adjudicated on their merits in state court unless the state court decision "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law . . . ." 28 U.S.C. § 2254(d)(1).

[122] Joseph J. Langkamer, *Harmless Error and AEDPA: Brecht's Applicability After Fry*, 80 TEMP. L. REV. 529, 551–52 (2007).

[123] *Id.* at 551–52 (discussing *Penry v. Johnson*, 532 U.S. 782 (2001) and *Early v. Packer*, 537 U.S. 3 (2002)).

[124] *Id.* at 553 (discussing *Mitchell v. Esparza*, 540 U.S. 12 (2003)).

[125] *Id.*

[126] *Fry v. Pliler*, 551 U.S. 112, 116–22 (2007).

[127] *Id.* at 119.

[128] *Id.* at 120.

[129] Langkamer, *supra* note 122, at 555.

[130] *Bond v. Beard*, 539 F.3d 256, 275–76 (3d Cir. 2008), *as amended* (Oct. 17, 2008).

[131] *Id.* at 275.

[132] *Id.* at 275–76.

[133] *Id.*

[134] 576 U.S. 257 (2015).

[135] *Id*. at 269 (quoting *Mitchell*, 540 U.S. at 18).

[136] *Id.* (quoting *Fry*, 551 U.S. at 119).

[137] *Id.* (alteration in original) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)).

[138] 850 F.3d 119 (3d Cir. 2017).

[139] *Id.* at 134.

[140] *Id.* at 133–34.

[141] *Johnson v. Superintendent Fayette SCI*, 949 F.3d 791, 798 (3d Cir. 2020) (quoting *Brecht*, 507 U.S. at 638).

[142] 596 U.S. 118 (2022).

[143] *Id.* at 122.

[144] *Id.* at 140.

[145] *Id.* at 127.

[146] *Id.* at 134.

[147] 95 F.4th 127, 135 (3d Cir. 2024) (first citing *Davenport*, 596 U.S. at 122, 127; then citing *Freeman v. Superintendent Fayette SCI*, 62 F. 4th 789, 802 (3d Cir. 2023); and then citing *Mathias v. Superintendent Frackville SCI*, 876 F.3d 462, 475 (3d Cir. 2017)).

[148] *Id.* at 139 (analyzing error under *Santobello v. New York*, 404 U.S. 257 (1971)).

[149] *Id.* at 135–39 & n.11.

[150] *Id.* at 139 (analyzing error under *Strickland v. Washington*, 466 U.S. 668 (1984)).

[151] *See, e.g.*, *Bond*, 539 F.3d at 275–76.

[152] *See, e.g.*, *Lamas*, 850 F.3d at 133–34; *Johnson v. Superintendent Fayette SCI*, 949 F.3d 791, 798 (3d Cir. 2020).

[153] *See Lacombe*, 95 F.4th at 135–139 ("elect[ing]" to analyze *Santobello* claim with *Brecht* but applying [the Act] to *Strickland* claim).

[154] *See Davenport*, 596 U.S. at 127 ("[S]atisfying *Brecht* is only a necessary, not a sufficient, condition to relief. [The Act] too must be satisfied.").

[155] And if the state court has **not** conducted a harmless error analysis, we defer to its decision under the Act unless we recognize a constitutional error the state court did not see, which would require us to do our own *Brecht* analysis. *See Fry*, 551 U.S. at 120–22 (holding *Brecht* is the appropriate standard to assess the prejudicial impact of a constitutional error in a state court trial when the error "is first recognized by a federal court"); *see also Turner v. Adminstr. N.J. State Prison*, No. 22-1668, 2023 WL 2808464, at *3 n.6 (3d Cir. Apr. 6, 2023) (where state court did not engage in harmless error analysis "because it found no constitutional error ab initio. . . . there is no 'decision'

subject to AEDPA deference as it pertains to harmlessness, and we engage in harmless error review pursuant to *Brecht* . . . .").

[156] The Supreme Court in *Davenport* made it a point to explain how *Fry* fits into the larger habeas landscape: "Rather than suggest *Brecht* duplicates [the Act] or vice versa, *Fry* thus stands as a reminder that the two tests impose analytically distinct preconditions to relief." *Davenport*, 596 U.S. at 138.

[157] *See, e.g.*, *Vaughn v. Ricci*, No. 10-1397, 2024 WL 1366482, at *18 (D.N.J. Apr. 1, 2024); *Sherrod Rice v. McGinley*, No. 17-1503, 2021 WL 2582303, at *17 (E.D. Pa. Feb. 16, 2021), *report and recommendation adopted sub nom. Rice v. McGinley*, No. 17-1503, 2021 WL 2577457 (E.D. Pa. June 22, 2021); *Lipinski v. Fisher*, No. 14-813, 2017 WL 879633, at *2 (W.D. Pa. Mar. 6, 2017).

[158] ECF 5; ECF 8 at 10 (using the pagination assigned by the CM/ECF docketing system).

[159] *Laird v. Sec'y, Pa. Dep't of Corr.*, 129 F.4th 227, 243 (3d Cir. 2025) (quoting *Abdul-Salaam v. Sec'y, Pa. Dep't of Corr.*, 895 F.3d 254, 265 (3d Cir. 2018)).

[160] *See Shakir v. Capozza*, No. 19-1652, 2022 WL 17492314, at *6 n.6 (W.D. Pa. July 7, 2022), *report and recommendation adopted*, No. 19-1652, 2022 WL 17090057 (W.D. Pa. Nov. 21, 2022).

[161] ECF 1-1 at 2 (using the pagination assigned by the CM/ECF docketing system).

[162] *Johnson II*, 236 A.3d at 1151 (quoting *Commonwealth v. Koch*, 39 A.3d 996, 1001 (Pa. Super. Ct. 2011)).

[163] *Id.* at 1151–52 (quoting *Koch*, 39 A.3d at 1001).

[164] *Id.* at 1152 (citing 18 PA. STAT. AND CONS. STAT. §§ 2501, 2502(b), (d)).

[165] *Id.* (quoting trial court opinion).

[166] *Id.* (quoting trial court opinion).

[167] *Id.* at 1152–53 (quoting trial court opinion).

[168] *Id.* at 1153 (quoting trial court opinion).

[169] *Id.* (quoting trial court opinion).

[170] ECF 8 at 12–13.

[171] *See Lacombe*, 95 F.4th at 134–35.

[172] *Rayner v. Superintendent Forest SCI*, No. 21-3230, 2023 WL 1433610, at *1 (3d Cir. Feb. 1, 2023) (citing *Jackson v. Virginia*, 443 U.S. 307 (1979)); *see also Ross v. Kyler*, No. 01-2579, 2002 WL 188713, at *3 (E.D. Pa. Feb. 4, 2002).

[173] *Jackson*, 443 U.S. at 319 (citing *Johnson v. Louisiana*, 406 U.S. 356, 360–63 (1972)).

[174] *Contra Rayner*, 2023 WL 1433610, at *1–*2 (holding "[t]he Pennsylvania Superior Court's decision denying Rayner's insufficient evidence claim was an objectively unreasonable application of Pennsylvania's analogue to the *Jackson* standard[]" because no evidence established when petitioner's DNA was left on the t-shirt connecting him to the crime).

[175] Trial Tr. vol. 1, 146:12–16 (ECF 16-5 at 39) (emphasis added).

[176] *Johnson V*, 2023 WL 2886741, at *4 (quoting *Commonwealth v. Burkett*, 5 A.3d 1260, 1270 (Pa. Super. Ct. 2010)).

[177] *Id.* (quoting *Burkett*, 5 A.3d at 1270).

[178] *Id.* at *5 (first quoting *Commonwealth v. Montalvo*, 244 A.3d 359, 368 (Pa. 2021); then quoting *Commonwealth v. Markman*, 916 A.2d 586, 613 (Pa. 2007)).

[179] *Id.* at *5 (discussing parallels between jury instructions at Mr. Johnson's trial and jury instructions in *Commonwealth v. Coon*, 26 A.3d 1159 (Pa. Super Ct. 2011)).

[180] *Id.* at *5 (quoting *Markman*, 916 at.2d at 613).

[181] *Id.* at *5–*6.

[182] The court cited to *Commonwealth v. Bishop*, 936 A.2d 1136 (Pa. Super. 2007), a different case where counsel's purported ineffectiveness was not prejudicial because the evidence of guilt was overwhelming. *Id.* at *6. The court did not explicitly state it reached the same conclusion with regard to Mr. Johnson's counsel, but we can infer it did since it denied Mr. Johnson relief.

[183] ECF 8 at 14.

[184] *Id.* at 14 n.10.

[185] *Id.*

[186] *Id.*

[187] Pennsylvania courts apply a "harmless error analysis . . . when determining whether the trial court erred in taking or failing to take certain action." *Commonwealth v. Howard*, 645 A.2d 1300, 1307 (Pa. 1994*)*. By contrast, a defendant claiming ineffective assistance of counsel must "show actual prejudice; that is, that counsel's ineffectiveness was of such magnitude that it 'could have reasonably had an adverse effect on the outcome of the proceedings.'" *Id.* (quoting *Commonwealth*

*v. Pierce*, 527 A.2d 973, 977 (Pa. 1987)). When a claim of counsel ineffectiveness occurs, as here, "in the context of counsel's failure to object to presumably erroneous jury instructions[,]" the Pennsylvania Supreme Court has held the correct standard to apply is *Strickland*/*Pierce*, not harmless error. *Commonwealth v. Spotz*, 84 A.3d 294, 320 (Pa. 2014) (finding the Superior Court "plainly erred" in utilizing the harmless error standard instead of the higher *Strickland*/*Pierce* standard). "In point of fact, [the Pennsylvania Supreme] Court has applied the *Strickland*/*Pierce* ineffectiveness measurement for assessing prejudice in reviewing claims of counsel ineffectiveness in the context of counsel's failure to object to presumably erroneous jury instructions." *Id.* (citing *Commonwealth v. Koehler*, 36 A.3d 121 (Pa. 2012)).

As noted above, the Superior Court in this case did cite to one opinion, *Commonwealth v. Bishop*, about the prejudice prong of the ineffective assistance test, but, on the whole, the court's analysis focused on harmless error. *See Johnson V*, 2023 WL 2886741, at *5–*6.

[188] *Hicks v. Brown*, No. 04-3393, 2007 WL 2459408, at *3 (D.N.J. Aug. 23, 2007) (citing *Johnson v. Rosemeyer*, 117 F.3d 104, 109 (3d Cir. 1997)).

[189] *Id.* (first citing 28 U.S.C. § 2254(a); then citing *Smith v. Horn*, 120 F.3d 400, 414 (3d Cir. 1997)).

[190] *Lacombe*, 95 F.4th at 134 (3d Cir. 2024) (alteration in original) (quoting *Davenport*, 596 U.S. at 122).

[191] *Id.* at 139 (quoting *Strickland*, 466 U.S. at 687–88).

[192] *Laird*, 129 F.4th at 243 (citing *Abdul-Salaam*, 895 F.3d at 265).

[193] *See id.* at 243–44.

[194] 280 F.3d 240 (3d Cir. 2002).

[195] *Id.* at 254–61.

[196] *Id.* at 258.

[197] *Pagliaccetti v. Kerestes*, 948 F. Supp. 2d 452, 458 (E.D. Pa. 2013), *aff'd*, 581 F. App'x 134 (3d Cir. 2014).

[198] *Whitney*, 280 F.3d at 258 (first quoting *Brecht*, 507 U.S. at 637; then quoting *Strickland*, 466 U.S. at 694).

[199] *Pagliaccetti v. Kerestes*, 581 F. App'x 134, 136 (3d Cir. 2014) (citing *Whitney*, 280 F.3d at 258).

[200] *Whitney*, 280 F.3d at 258.

[201] *See Lamas*, 850 F.3d at 134.

[202] *Id.* (quoting *Ayala*, 576 U.S. at 270).

[203] *Chapman*, 386 U.S. at 24.

[204] *Johnson V*, 2023 WL 2886741, at *5–*6.

[205] *Chapman*, 386 U.S. at 24 ("[T]he beneficiary of a constitutional error [must] prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.").

[206] *See Green v. Att'y Gen. N.J.*, 841 F. App'x 420, 424 (3d Cir. 2021) (finding, with respect to a flawed jury instruction, "a fair-minded jurist could find that this error was harmless because there was considerable evidence proving that Green killed Munroe.").

[207] *Lamas*, 850 F.3d at 134 (quoting *Ayala*, 576 U.S. at 270).

[208] *Pagliaccetti*, 581 F. App'x at 136 (citing *Whitney*, 280 F.3d at 258).

[209] Even if Mr. Johnson could show the trial court error was not harmless and his trial counsel was ineffective, his claim about his post-conviction counsel's ineffective assistance would fail because "claims of postconviction-counsel ineffectiveness are not cognizable in federal habeas proceedings." *Washington v. Att'y Gen. of Del.*, No. 23-2756, 2024 WL 1251349, at *1 (3d Cir. Feb. 7, 2024) (citing 28 U.S.C. § 2254(i)).

[210] ECF 1-1 at 2.

[211] Trial Tr. vol. 1, 142:1–11 (ECF 16-5 at 38).

[212] *Id.* at 157:7–11 (ECF 16-5 at 42).

[213] *See Rainey v. Varner*, 603 F.3d 189, 198 (3d Cir. 2010) ("A habeas corpus petition prepared by a prisoner without legal assistance may not be skillfully drawn and should thus be read generously.").

[214] *Johnson V*, 2023 WL 2886741, at *6 (citing *Commonwealth v. Speight*, 854 A.2d 450, 458 (Pa. 2004)).

[215] *Id.* at *6.

[216] *Id.*

[217] *See Hicks*, 2007 WL 2459408, at *3 (citing *Rosemeyer*, 117 F.3d at 109).

[218] *Lacombe*, 95 F.4th at 134–35.

[219] *Laird*, 129 F.4th at 243.

[220] *See Davenport*, 596 U.S. at 135.

[221] *Chapman*, 386 U.S. at 24; *see also* 28 U.S.C. § 2254(d)(1).

[222] *Jefferson v. Sherrer*, No. 03-1414, 2005 WL 2777557, at *9 (D.N.J. Oct. 25, 2005) (first citing *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); then citing *United States v. Olano*, 507 U.S. 725, 740 (1993)).

[223] *Cf. Davies v. Powell*, No. 19-12194, 2022 WL 1664535, at *9 (D.N.J. May 24, 2022) (holding, where the trial court did not instruct the jurors on unanimity, "any error is harmless in light of the fact that the jury acquitted Petitioner of murder." (citing *Brecht*, 507 U.S. at 637)); *see also Bronshtein v. Horn*, 404 F.3d 700, 710 (3d Cir. 2005) ("[W]hile the trial court's instructions regarding the first degree murder charge were such that the jury could have convicted him of this charge without finding that he had a specific intent to kill Gutman, the court's instructions regarding conspiracy to commit murder and the jury's verdict of guilty on that charge demonstrate beyond a reasonable doubt that the jury made the required finding of specific intent.").

[224] *Lamas*, 850 F.3d at 134 (if a fair-minded jurist could agree with the Superior Court's conclusion of harmless error, "then Johnson 'necessarily cannot satisfy' *Brecht* . . . ."); *Pagliaccetti*, 581 F. App'x at 136 ("[A]n error that is harmless under *Brecht* is also considered non-prejudicial under *Strickland*." (citing *Whitney*, 280 F.3d at 258)).

[225] ECF 1-1 at 3.

[226] ECF 8 at 18.

[227] *Id.* at 19.

[228] *Id.*

[229] 42 PA. STAT. AND CONS. STAT. § 9545(b)(3).

[230] *Johnson IV*, slip op. at 10.

[231] The Commonwealth does not address procedural default with regard to Mr. Johnson's fourth claim for relief, so we do it sua sponte. *See Biggins v. Carroll*, No. 99-1880, 2002 WL 31107365, at *1 (D. Del. Sept. 23, 2002) ("As a matter of federal habeas law, a court may raise the issue of procedural default sua sponte, notwithstanding the respondents' failure to assert it." (citing *Szuchon v. Lehman*, 273 F.3d 299, 321 (3d Cir. 2001))).

[232] ECF 14 at 5.

[233] ECF 1-1 at 3.

[234] ECF 14 at 10–11.

[235] *United States v. Duffus*, 174 F.3d 333, 336 (3d Cir. 1999) (citing *Riley v. Taylor*, 62 F.3d 86, 89 (3d Cir. 1995)).

[236] *Id.* at 337 (quoting Fed. R. Civ. P. 15(a)).

[237] *Id.*

[238] *Id.*

[239] *Id.* at 337–38.

[240] ECF 5 at 3.

[241] 28 U.S.C. § 2254(b)(1)(A).

[242] *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

[243] *Rodland v. Superintendent of SCI Houtzdale*, 837 F. App'x 915, 920 (3d Cir. 2020) (citing *Lambert v. Blackwell*, 387 F.3d 210, 232–34 (3d Cir. 2004)).

[244] *Id.* (citing *McCandless v. Vaughn*, 172 F.3d 255, 261 (3d Cir. 1999)).

[245] *Nellom v. Sober*, No. 21-2835, 2022 WL 3350373, at *6 (E.D. Pa. Aug. 12, 2022) (citing *McCandless*, 172 F.3d at 260).

[246] *See Johnson V*, 2023 WL 2886741, at *3.

[247] *See id.*

[248] Pa. R. A. P. 903 (a notice of appeal must be filed within thirty days after the entry of the order).

[249] *Lines v. Larkins*, 208 F.3d 153, 165 (3d Cir. 2000).

[250] *Leyva v. Williams*, 504 F.3d 357, 366 (3d Cir. 2007) (quoting *Larkins*, 208 F.3d at 166).

[251] ECF 14 at 2 (citing *Townsend v. Sain*, 372 U.S. 293 (1963), *overruled in part on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992)). Mr. Johnson also cites a number of other cases for essentially the same proposition. *See id.*

[252] *Id.* at 3, 7, 9, 11.

[253] *Townsend*, 372 U.S. 293 at 319.

[254] *Id.*

---

[255] 550 U.S. 465, 473–74 (2007) (quoting 28 U.S.C. § 2254(e)(1)).

[256] *Id.* at 474.

[257] *Id.*

[258] 563 U.S. 170, 181 (2011).

[259] *See Robinson v. Johnson*, 313 F.3d 128, 133 n.2 (3d Cir. 2002) (citing *Dunn v. Colleran*, 247 F.3d 450, 456 (3d Cir. 2001)).

[260] 28 U.S.C. § 2253(c)(1)(A).

[261] *Id.* § 2253(c)(2).

[262] *Washington*, 2024 WL 1251349, at *1 (quoting *Buck v. Davis*, 580 U.S. 100, 115 (2017)).

[263] *Id.* (quoting *Slack v. McDaniel*, 529 U.S. 473, 484)).